UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARL A. WATKINS,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant.<br>_____/ | Case No. C-07-02152 JCS<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND AFFIRMING DECISION OF THE COMMISSIONER [Docket Nos. 12, 14]** |

**I.    INTRODUCTION**

Plaintiff, Carl Watkins, filed a complaint on April 18, 2007 seeking review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his Application for Disability Insurance benefits under Title II of the Social Security Act ("SSA"). Plaintiff asks the Court to reverse the Commissioner's denial of disability insurance benefits and remand with instructions to award benefits or, in the alternative, to remand for additional administrative proceedings. Plaintiff filed a motion for summary judgment pursuant to 42 U.S.C. § 405(g) ("Plaintiff's Motion"). The Commissioner responded with a cross-motion for summary judgment ("Defendant's Motion"). The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons stated below, Plaintiff's Motion is DENIED. Defendant's Motion is GRANTED. The decision of the Commissioner is AFFIRMED.

**II.    BACKGROUND**

**A**.    **Plaintiff's Background**

Plaintiff was born on December 21, 1963. Administrative Record ("AR") at 124. At the alleged onset date, January 2, 2003, Plaintiff was 39 years old. AR at 33. He completed high school as well as one year of post-secondary education. AR at 130.

1

### B. Plaintiff's Work History

Plaintiff testified that in 1989, he started his own automobile repair company, "One Stop Auto Service," of which he was the sole owner. AR at 420. According to Plaintiff, he opened a new store approximately every year and a half until he had seven stores and 120 employees. AR at 420, 449. In 2001, however, Plaintiff began to sell his stores and by 2003, he was down to one store, in Union City, California. AR at 444, 449. Plaintiff testified that during the years he operated his business, the business made profits "pretty much every year," but that there were some years when the business experienced losses. AR at 420. Plaintiff's profits and losses for the years 1995 through 1999 are reflected in tax records that were submitted to the Administrative Law Judge ("ALJ"). AR at 142-253. In addition, SSA records contain some information concerning Plaintiff's earnings for these and subsequent years. AR at 112-15. The SSA records reflect the following earnings: $51,300 (1990), $53,400 (1991), $55,500 (1992), $57,600 (1993), $39,887 (1994), $0 (1995), $31,500 (1996), $25,000 (1997), $0 (1998), $9,562 (1999), $76,200 (2000) and $0 (2001-2004). AR at 112-15. Plaintiff sold his last store in 2003. AR at 454. According to Plaintiff, he became unable to work due to his disability on January 2, 2003. AR at 108.

Plaintiff testified that when he was running One Stop Auto Service, he engaged in both management of the company – including hiring and firing of employees, maintaining business licenses, approving lay-outs for advertising – and hands-on work with the cars. AR at 444-48, 456-58. Plaintiff testified that he spent more than half of each day engaged in hands-on work, and that this work required him to occasionally lift parts that weighed 120 or 130 pounds and regularly lift parts that weighed 60 or 70 pounds. AR at 447-48.

### C. Plaintiff's Real Estate and Securities

Plaintiff testified that he "purchased a few homes in [his] lifetime" and that he had been "selling them off." AR at 455. He testified that he managed the properties that he still owned, which he rented out, and that he co-owned at least one property with his sister. AR at 455. According to Plaintiff, he did not make any income from these properties, which were only breaking even. AR at 455.

Plaintiff's 1998 tax returns state that he sold securities in that year for $1,175,984, taking a

2

1  loss of a few thousand dollars. AR at 205. Plaintiff's 1999 tax returns reflects multiple securities
2  sales, with a total sales price of $2,668,040.00 and net losses of $36,514.00. AR at 234.

### D.     Plaintiff's Medical History

Plaintiff has a history of degenerative disc disease. In July 1996, Plaintiff was diagnosed with degeneration of the L3/L4 disc with small central disc extrusion, degeneration of the L4/L5 disc with small broad-based protrusion, and annular fissuring with very small central protrusion at L5-S1. AR at 311-12 (Diagnostic Radiology Consultation dated July 16, 1996). In May 2000, Plaintiff's physician, Dr. Robert Millard, referred Plaintiff for an MRI of the lumbar spine. AR at 309-10 (MRI of the Lumbar Spine, dated May 11, 2000). The May 2000 MRI resulted in a similar diagnosis to the one described above. *Id*. In March 2002, Dr. Millard referred Plaintiff for another MRI. AR at 307-08 (MRI of the Lumbar Spine, dated March 7, 2002). The March 2002 MRI revealed that Plaintiff's degenerative disc problems had become more severe compared to Plaintiff's condition in May 2000. *Id*. In particular, the degeneration of the L4/L5 disc had become "more severe" and the degeneration of the L3/L4 disc had become "slightly more severe" while the L5/S1 annular fissuring was unchanged. *Id*.

In August 2002, Dr. Millard performed a lumbar selective epidural block to alleviate Plaintiff's pain. AR at 280-81. According to a follow-up evaluation approximately one year later, Dr. Millar noted that the epidural block had "provided significant pain relief for eight to nine months." AR at 279. However, by August 2003, Plaintiff was experiencing low-back, bilateral buttock and right leg pain. AR at 279. Dr. Millard's notes from an exam conducted on August 28, 2003, reflect that Plaintiff's exam was "extremely good" and that his "neurologic status" was "normal." *Id*. Plaintiff could perform straight leg raising to 80 degrees, bilaterally, without back, leg or buttock pain. *Id*. Lumbar forward flexion and extension provoked L4/L5 segmental pain only. *Id*. Notwithstanding the good exam, Dr. Millard noted that Plaintiff "really ha[d] not improved much with therapeutic exercise and Vioxx" and stated that "[b]ecause of the current level of his pain, the plan is to proceed with epidural procedures." *Id*.

Dr. Millard performed another selective epidural block on September 15, 2003. AR at 276-78. In a follow-up conversation with Dr. Millard on October 9, 2003, Plaintiff told Dr. Millard that his back and leg symptoms had "improved" since the epidural. AR at 275.

On December 19, 2003, Plaintiff went to see a neurosurgeon, Dr. Lieberson, for an evaluation. AR at 269. In the initial evaluation notes, Dr. Lieberson described Plaintiff as "an almost 40 year old, right-handed, retired automobile mechanic owner, who has reportedly a long history of chronic back and right leg pain." *Id*. According Dr. Lieberson, Plaintiff was experiencing "back pain and very severe right leg pain" when he came in. *Id*. Dr. Lieberson wrote that the "[r]ange of motion of the back is surprisingly good," but he noted that "hydration and desiccation of each of the three lumbar levels" could be seen in the films Plaintiff had brought in. *Id*. Dr. Lieberson ordered a new MRI and Electromyography ("EMG"). *Id*. The EMG was ordered "to see if we can figure out which nerve root is affected since the examination does not guide and since there are at least three abnormal levels on the MRI." AR at 269-70.

The MRI report, dated December 23, 2003, included the following impressions:

1. 7 mm broad central and paramedian L2-3 protrusion with annular tear.
2. 5 mm L3-4 protrusion with annular tear.
3. 5 mm L4-5 protrusion with annular tear.
4. 4 mm central and left paramedian L5-S1 protrusion with annular tear.
5. Mild left and mild to moderate right L4-5 foraminal narrowing.

AR at 256.

On July 14, 2004, Plaintiff was examined by Dr. Lieberson again. AR at 268. Dr. Lieberson stated that Plaintiff was "miserable" and that he described "agonizingly severe back and right leg pain." *Id*. Dr. Lieberson noted that a discogram (the EMG) performed in April had shown "positive findings on every tested level" and, therefore, was not useful for showing where surgery might be helpful. *Id*. He also stated that he would "not be anxious to do a three-level fusion." *Id*. Dr. Lieberson expressed concern about continued use of epidural blocks to alleviate Plaintiff's pain, noting the possible risks associated with them, but concluded, "[g]iven how miserable the patient is and given that I don't have all the alternatives, they seem reasonable in this case." *Id*.

4

1    On July 17, 2004, Dr. Millard performed another epidural block. AR at 373. An MRI on
2 July 28, 2004, revealed that Plaintiff's disc herniation was "actually smaller" than previously
3 observed. AR at 305. The MRI report concluded with the following impression:

> 1. Interval development of a moderate sized disc extrusion into the central to right paracentral locations of the anterior epidural space at L2-3 with associated moderate narrowing of the right lateral recess and mild central canal narrowing.
>
> 2. Disc degeneration with small herniations and posterior annular fissuring at L3-4, L4-5, and L5-S1, all of which have decreased in the interval slightly. There is still posterior displacement of the left S1 nerve roots by the disc herniation at L5-S1. There is also mild-moderate right lateral recess narrowing at L4-5 due to the protruding disc.
>
> 3. No foraminal herniations and foraminal stenosis at any level. Also, only mild attenuation of the thecal sac at the disc levels from L2-3 to L5-S1 due to the disc pathology.

*Id.*

In a July 29, 2004 telephone conversation with Dr. Millard, Plaintiff reported that he was experiencing right anterolateral thigh and leg pain and paresthesias. AR at 272. Plaintiff was taking Vioxx for his pain, which he reported was more effective than other pain medications he had been prescribed. *Id.* On August 10, 2004, Plaintiff reported to Dr. Millard that he had improved since July 29, 2004, and was "now primarily experiencing right buttock pain." AR at 274. Plaintiff reported that his anterolateral thigh and leg symptoms had "improved significantly" and that he was performing lumbar stabilization exercises. *Id.* Plaintiff continued to take Vioxx for pain, but no longer required narcotics. *Id.*

Dr. Millard performed an additional epidural block on January 10, 2005. AR at 330. In a January 25, 2005 telephone call, Plaintiff reported to Dr. Millard that he "noticed significant reduction in his back and leg symptoms." AR at 328. Dr. Millard noted, "[h]e will occasionally experience some leg symptoms, but this seems to be well controlled with Celebrex." *Id.*

Dr. Millard performed another epidural block on July 18, 2005. AR at 324.

An MRI performed in February 2006 reveals the following:

Vertebral body height, alignment conus and visualized portions of the retroperitoneum are normal. There are degenerative changes at multiple levels.

T12-L1, L1-2: The discs are normal in height and hydration without significant disc bulge or herniation. Foramina are patent.

5

> L2-3: There is mild loss of disc height and signal. There is a 4 mm broad based central and right paramedian subligamentous protrusion with annular tear. There is mild bilateral foraminal narrowing.
>
> L3-4: There is mild loss of disc height. There is disc desiccation and there is a 4 mm broad based central subligamentous protrusion with annular tear. There is mild to moderate foraminal narrowing.
>
> L4-5: There is mild loss of disc height. There is disc desiccation with a 3 mm broad based posterior and left laramedian subligamentous protrusion with annular tear. There is mild to moderate bilateral foraminal narrowing.
>
> L5-S1: Disc height is normal. There is a 5 mm left paramedian subligamentous protrusion with annular tear which impinges upon the left S1 nerve root at its origin. There is mild to moderate foraminal narrowing.

AR at 349-50.

### E.  Physical Residual Functional Capacity Assessments

#### 1.  Dr. Millard

Dr. Millard completed a Residual Functional Capacity Questionnaire ("RFC") on December 8, 2005. In it, he stated that Plaintiff's prognosis was good, AR at 314, but that Plaintiff's pain would frequently interfere with Plaintiff's attention and concentration. AR at 315. He stated that Plaintiff had the following functional limitations: Plaintiff could sit or stand no more than 5 minutes at a time; could sit or stand/walk no more than 2 hours out of an 8-hour day; needed to walk around every 20 minutes for 2-3 minutes; could lift up to 20 pounds occasionally; could twist, stoop, crouch/squat and climb ladders rarely; could climb stairs occasionally. AR at 316-17. Dr. Millard further stated that Plaintiff was likely to have good days and bad days, and that he would need to be absent from work more than four days a month as a result.

#### 2.  State Agency Doctor

A State Agency Doctor, Dr. Chokatos, completed an RFC for Plaintiff on October 3, 2004. AR at 284-91. Dr. Chokatos concluded that Plaintiff was subject to the following limitations: Plaintiff could occasionally or frequently lift or carry up to 10 pounds;[1] could stand and/or walk at

---

[1] Dr. Chokatos checked a box indicating that Plaintiff could lift 10 pounds only occasionally and then checked a box in the next question stating that Plaintiff could lift 10 pounds frequently.

6

1 least 2 hours in an 8-hour workday; could sit about 6 hours in a normal work day; could push or pull
2 without limitations, could climb, balance, stoop, kneel, crouch or crawl occasionally. *Id.*

### F. Daily Activities Questionnaire

Plaintiff completed a Daily Activities Questionnaire on January 28, 2004. In it, Plaintiff states that he can take care of himself, but that sometimes he needs help with dressing and walking, depending on his pain. AR at 126. He states that he has trouble bending and walking, and that he can walk only 40 yards before he needs to "rest and take it slow." *Id*. He states that he tries to avoid stairs, that he doesn't lift things that are over 10 pounds and tries to avoid lifting altogether, and that he does not do his own cleaning. AR at 127. He states that he is able to drive about 1 hour at a time 3 times a week. *Id*. He states that his outdoor activities are walking and sitting on his patio swing, and that he no longer works on his car, bowls, or plays tennis as he used to. AR at 127-28. He reports that he takes Vioxx, Torpol, Vicodin and Allperinal daily for his pain. AR at 128. He concluded by stating, "For the last 14 years I was doing pain management care. But now it does not help. I just got 3 injections in Sept 03, and it did nothing." *Id*.

### G. The Administrative Hearing

A hearing was held on July 13, 2006. Plaintiff appeared with his attorney, Harvey Sackett. A vocational expert, Malcolm Brodzinsky, was also present, but he did not offer any testimony.[2]

The ALJ began by questioning Plaintiff about his tax returns in connection with the question of Plaintiff's date last insured. AR at 439-41. He prefaced his questions with the statement, "[a]s I'm looking over the tax returns, and I don't claim to have any great expertise in taxes, it appears that these returns do not show taxable income." AR at 439. Plaintiff conceded this was correct and that as a result, his date last insured – based on SSA income records – was December 2003. *Id*.

The ALJ then asked Plaintiff about his auto repair business and Plaintiff's day-to-day activities and responsibilities as owner of the business. AR at 448. In response to the ALJ's

---

[2] The ALJ's decision states that vocational expert Gerald Belchik "appeared and testified" at the ALJ's request. AR at 27. This is incorrect. The transcript of the July 13 hearing indicates that Gerald Belchik was not present and that neither Belchik nor Brodzinsky offered any testimony at the hearing.

1 question why Plaintiff stopped working, in 2003, Plaintiff stated that he was no longer able to
2 perform his duties due to his lower back and leg pain. AR at 448. He explained that he was missing
3 work "two, three weeks at a time." *Id*. He testified that he could not continue working but stop the
4 hands-on portion of his work because during these periods he was "laying flat in bed" due to the
5 pain medication he was taking. *Id*.

Plaintiff testified that he had been receiving epidural blocks since he was 25 years old and
that at the time of the hearing he was getting a block every ninety days. AR at 449. He stated that
they help the leg pain but that they do not help the back pain. *Id*. He testified that although the
epidurals in 2003 and 2004 gave him some relief, so that he could move his leg, they did not take the
pain away altogether. AR at 450. He also testified that his doctors had stopped prescribing Vioxx
because it was causing problems with high blood pressure. AR at 450.

The ALJ asked Plaintiff to describe his abilities with respect to walking and sitting in
2003/2004. AR at 451. According to Plaintiff, after an epidural injection, he could walk 20 to 30
minutes at a time. *Id*. He testified that he could sit for 10 or 15 minutes before he needed to stand
up. AR at 452. He testified that he could pick up his two-year-old son, who weighed about 25
pounds, AR at 453, but that he could not do this "repetitively throughout the day," but rather just
when his son was crying. AR at 459. He also testified that he sent his son to daycare because he
"couldn't have him there all day." *Id*. Plaintiff also testified that he did some cooking, but that this
usually meant "throw[ing] something in the microwave." AR at 459-60. He explained that if he
tried to cook a meal "it's a little more difficult" because of the standing involved. *Id*.

Plaintiff testified that he was taking Vioxx, Vicodin and Naprosyn for pain in 2003. AR at
454. Plaintiff testified that these pain medications made him feel groggy. AR at 458.

At the conclusion of the hearing, the ALJ stated that he did not have any questions for the
vocational expert because the Grid could address whether Plaintiff was disabled. AR at 460.

### H.     The ALJ's Five-Step Analysis and Findings of Fact

Disability insurance benefits are available under the Social Security Act when an eligible
claimant is unable "to engage in any substantial gainful activity by reason of any medically
determinable physical or mental impairment . . . which has lasted or can be expected to last for a

8

continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work, but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 4239(d)(2)(A). The claimant bears the burden of proof in establishing a disability. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996).

The Commissioner has established a sequential five-part evaluation process to determine whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a). At Step One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 1520(a)(4)(I). If he is, the Commissioner finds that the claimant is not disabled, and the evaluation ends. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two.

At Step Two, the Commissioner considers whether the claimant has "a severe medically determinable physical or mental impairment," or a combination of such impairments, which meets the duration requirement in 20 C.F.R. § 404.1509. An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." C.F.R. § 404.1520(c). In addition, the physical or mental impairment (or combination of impairments) must have lasted, or must be expected to last, for a continuous period of 12 months. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509. If the claimant does not have a severe impairment for the required duration, the Commissioner finds the claimant not disabled and the evaluation ends at this step. C.F.R. § 404.1520(c). Age, education, and work experience are not considered at this step. *Id*.

At Step Three, the Commissioner considers whether the claimant's impairment, or impairments, "meets or equals" one of the Social Security Administration's compiled listings ("the Listings") of impairments that the Commissioner has established as disabling. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets one of these listed impairments, the Commissioner will find the claimant disabled. If the impairment does not meet one of the listed impairments, the process continues to Step Four.

1    At Step Four, the Commissioner considers whether the claimant, in light of his residual functional capacity ("RFC"), can continue to perform work he has performed in the past. 20 C.F.R. § 404.1520(a)(4)(iv). Based on the relevant medical evidence and other evidence in the record, the Commissioner will assess the claimant's RFC to determine whether the claimant can do his past work. 20 C.F.R. § 404.125(e). If the RFC assessment determines that the claimant can perform his past work, the Commissioner will find him not disabled. 20 C.F.R. § 404.1520(f). If the RFC assessment determines that the claimant cannot perform his past work, then the claimant proceeds to Step Five of the evaluation.

At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can "make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner will find him disabled. *Id.* At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of his impairments, age, education, and work experience, can adjust to other work in the national economy, and that such a job actually exists. *Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995).

In this case, the ALJ began by addressing Plaintiff's past work history to determine whether Plaintiff met Step One of the disability analysis, that is, whether Plaintiff had engaged in substantial gainful activity since his alleged onset date. AR at 28-29. The ALJ expressed skepticism about Plaintiff's motives for stopping working. AR at 29. He pointed to fluctuations in the earnings Plaintiff reported for his business, noting that it was "difficult to understand" how plaintiff's earnings could be so "erratic." *Id.* He stated, "it is difficult to accept that a business with receipts exceeding $300,000 one year had no earnings the next three." *Id.* He also pointed to Dr. Lieberson's descriptions of Plaintiff as "retired" in his evaluation. *Id.* The ALJ continued:

> With respect to the date by which the claimant stopped working in the business, the claimant testified that this was in January 2003. Yet he told his doctor on December 19, 2003, nearly a year later, that he had "*recently* retired and has *just sold off* his several auto mechanic businesses. . . . If the claimant sold the businesses because he no longer was able to perform the work, it is far more likely that he would have said as much to his treating neurosurgeon rather than hide his medical condition and say that he had simply "retired." It certainly is a real possibility that, having had no income from the business for

> three years, the claimant quite understandably decided to sell it for business reasons and retire. Although not determinative, the claimant did cash out nearly $1.2 million in securities in 1998, another action consistent with a plan to retire. . . .

AR at 29. The ALJ went on to conclude, "[t]here is nothing sufficient on the record to rebut [Plaintiff's] testimony that he sold his business and did not engage in substantial gainful activity after his alleged onset date of January 2, 20003. I add, however, that I will consider the unanswered questions later in my analysis as I evaluate the claimant's credibility." AR at 29-30.

At Step Two, the ALJ found that the medical evidence established that Plaintiff suffers from a severe impairment, namely, degenerative disc disease in the lumbar spine. The ALJ found that although there is evidence in the record that Plaintiff has hypertension and hypercholesterolemia, these conditions are not severe impairments because they are well-controlled with medication.

At Step Three, the ALJ found that Plaintiff's impairment does not meet a Listing.

At Step Four, the ALJ addressed Plaintiff's RFC. The ALJ began by noting that "[]he claimant's doctors' objective observations offer little to suggest that his condition is debilitating." AR at 31. According to the ALJ, Dr. Millard "found no abnormalities" in August 2003. *Id*. (citing AR at 279) and in December 2003, Dr. Lieberson found "no focal neurological deficits and 'surprisingly good range of motion' in his lumbar spine." *Id*. (citing AR at 269). The ALJ noted that while Plaintiff told Dr. Lieberson in July 2004 that he was "miserable" and was experiencing agonizingly severe back and leg pain, Dr. Lieberson found only "positive straight leg raising" with all of his other findings normal. The ALJ also found that although Plaintiff had experienced "exacerbations" of his pain, these had been treated successfully with epidural blocks, giving Plaintiff relief from his pain for 8 to 9 months at a time. *Id*. In the interim, the ALJ found, Plaintiff was able to control his pain with exercises and Vioxx. *Id*. With this in mind, the ALJ adopted the limitations contained in the RFC provided by the State Agency doctor. *Id*. In particular, the ALJ adopted the following RFC: no more than 10 pounds lifting, standing and waking no more than 2 hours in an 8-hour workday, sitting no more than 6 hours in and 8-hour work day and only occasional climbing, balancing, stopping, kneeling, crouching, or crawling. *Id*.

The ALJ found that the RFC of the State Agency doctor was consistent with the pain testimony offered by Plaintiff because, while the ALJ "credit[ed] Plaintiff's pain testimony regarding the kind of pain that he experiences," he found "that the exacerbations, as 'miserable' as they are, [do not] amount to anything greater than short-term events, controlled medically, and recurring so seldom as not to affect the claimant's employability." The ALJ further found that "the nerve blocks consistently and significantly reduce the claimant's back and lack pain, at times for nearly a year." *Id*. While the ALJ accepted Plaintiff's testimony as to the *kind* of pain he experienced, however, the ALJ added that "the unanswered questions concerning the claimant's work history and earnings . . . bring his credibility into some doubt, especially his statement to his neurosurgeon that he stopped working because he 'retired,' not because he was medically unable to work." AR at 31-32.

The ALJ rejected the RFC offered by Plaintiff's treating physician, Dr. Millard, explaining his conclusions as follows:

> I give little weight to Dr. Millard's opinion insofar as it disputes that of the State Agency. Generally, we give great weight to the opinion of a treating physician, and under certain circumstances not present here, we give it controlling weight. I find myself limited in crediting Dr. Millard because I find his opinion (1) somewhat inconsistent internally, (2) inconsistent with the medical evidence in the record, and (3) inconsistent with the statements of the claimant himself. For example, Dr. Millard described the claimant's prognosis as "good" [AR at 314]. The limitations that he supported apply at all times, when the record shows that such extreme limitations as walking no more than 2 minutes out of 20, apply only to the claimant's infrequent exacerbations, not all the time. The claimant himself testified that he was able to walk for 20 to 30 minutes at a time, which is far from the 2 to 3 minutes that Dr. Millard opined. The claimant also stated that he was able to pick up his 25-pound son and that he could do some cooking, watching television, and reading. Thus, while it is clear that the claimant has some very real functional restrictions, they are not as limiting as Dr. Millard stated.

AR at 32.

In light of the limitations discussed above, the ALJ concluded that Plaintiff was not capable of performing his past relevant work.

At Step Five, the ALJ relied on the Grids, and, specifically, Rules 201.28 and 201.29, to conclude that Plaintiff was not disabled. AR at 33. This conclusion was based on the ALJ's

12

findings that Plaintiff was a "younger person" with a "high school education and above" who could perform "sedentary" work. *Id*.

### I. The Motions

Plaintiff asserts that the ALJ erred in finding that he was not disabled in three respects: 1) the ALJ failed to provide specific and legitimate reasons for rejecting the RFC of his treating physician, Dr. Millard; 2) the ALJ erred in relying on Plaintiff's tax records and the reference in his medical records to being "retired" as a basis for rejecting Plaintiff's testimony regarding his limitations and did not provide any other clear and convincing reasons for doing so; and 3) the ALJ erred in failing to elicit testimony from the vocational expert to support his finding of not disabled because Plaintiff suffered from both exertional and non-exertional limitations, namely pain and concentration deficit.

In response, the Commissioner argues that the ALJ did not err in finding Plaintiff not disabled. In its brief, the Commissioner begins by offering an eight-page analysis of Plaintiff's tax records. The Commissioner acknowledges that "it would take a forensic accountant to get down to the bottom of Plaintiff's financial affairs," but nonetheless attempts to do so, ultimately concluding that Plaintiff was not really an auto mechanic but was actually a "business man who spent his time accumulating capital, in the form of real estate, stock and perhaps other securities, and the management of auto repair businesses." The Commissioner implicitly concedes that its argument goes far beyond the reasoning of the ALJ, who had an only an "inkling" regarding the true nature of Plaintiff's work history. It argues, however, that the discrepancy between Plaintiff's characterization of his past work and Plaintiff's financial records strongly supports the conclusion that Plaintiff's description of his limitations is not credible.

To further support its credibility argument, the Commissioner offers new evidence regarding the length of Plaintiff's commute from his businesses in Union City and Novato to a residence he purchased in 2003, in Discovery Bay, California. The Commissioner also notes that Discovery Bay is "perhaps significantly . . . located on waterways in the San Joaquin and Sacramento Rivers Delta water system, well-known for the recreational opportunities afforded homeowners in the area." This evidence, the Commissioner asserts, offers further grounds for finding Plaintiff to be less than credible.

1    The Commissioner further asserts that the ALJ properly rejected the RFC of Dr. Millard and
2 that because the RFC the ALJ adopted did not include non-exertional limitations, reliance on the
3 Grids for a finding of not disabled was not erroneous.

**III.   ANALYSIS**

    **A.   Legal Standard**

When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and "supported by substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind accepts as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence means "more than a mere scintilla" but "less that a preponderance." *Id*. *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). Even if the Commissioner's findings are supported by substantial evidence, they should be set aside if proper legal standards were not applied when using the evidence to reach a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978). In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

    **B.   New Evidence and Arguments**

As a preliminary matter, the Court addresses the extensive reliance by the Commissioner on new arguments and evidence in support of its position that Plaintiff is not disabled, which the Court declines to consider.

First, to the extent that the Commissioner offers an interpretation of Plaintiff's financial records that goes far beyond the reasoning offered by the ALJ, the Court finds that reliance on those arguments is inappropriate. *See Am. Textile Mfr.'s Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981) ("the *post hoc* rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action").

Second, even if it were to consider these arguments, the Court declines to accept the Commissioner's interpretation of Plaintiff's financial documents. The Commissioner's theories are supported by no expert testimony and Plaintiff was not offered an opportunity to respond to these

14

new theories. As the Commissioner conceded, it would take a "forensic accountant to get down to the bottom of Plaintiff's financial affairs."

Third, the Commissioner misrepresents the record to the extent it implies that Plaintiff characterized his former work as that of an "auto mechanic" and that the ALJ accepted that description. It is evident from the ALJ's opinion that he understood that Plaintiff was the *owner* of an auto mechanic business. Nor is there any testimony in the record suggesting that Plaintiff attempted to hide this fact. Similarly, the ALJ was aware that Plaintiff had been involved in the purchase and sale of securities and real estate. Again, the Commissioner has pointed to no specific testimony by Plaintiff that suggests otherwise, and the Court has found none.

Fourth, the new evidence offered by the Commissioner regarding Plaintiff's move to Discovery Bay may not be considered. *See id.* While there are limited circumstances in which a social security *claimant* may be permitted to offer new evidence on review, the Commissioner has pointed to no authority suggesting that the agency may supplement the record on review with additional evidence to bolster the ALJ's finding that a claimant is not disabled. Indeed, given the established rule against post-hoc rationalizations, it is clear that the Court may not and should not consider such evidence. The Court further notes that even if it were to consider the evidence proffered by the Commissioner regarding the distance between Discovery Bay and Plaintiff's auto shops, there is no evidence in the record that Plaintiff ever actually commuted from Discovery Bay.

Finally, the Commissioner' insinuation that Plaintiff might have moved to Discovery Bay to engage in water sports is neither helpful nor appropriate, as there is not a shred of evidence that Plaintiff has engaged in such sports.

### C. The ALJ's Rejection of Dr. Millard's RFC

Plaintiff asserts that the ALJ committed reversible error when he rejected the RFC of Dr. Millard, adopting instead the limitations set forth in the RFC of the State Agency doctor. Plaintiff focuses in particular on Dr. Millard's opinions that Plaintiff's impairment would interfere with his ability to concentrate on a "frequent" basis and that Plaintiff would need to be absent from work for at least four days a months. Having carefully reviewed the record, the Court concludes that although not all of the reasons offered by the ALJ are supported by substantial evidence, this error is harmless

because the ALJ also offered reasons that provided a sufficient basis for rejecting Dr. Millard's RFC.

Although the ALJ may consider many sources, the opinion of a treating physician normally is given special weight. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). If the ALJ decides to disregard the treating physician's opinions, he "must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). Here, the ALJ offered the following reasons for rejecting Dr. Millard's testimony: 1) the RFC is inconsistent with Plaintiff's own testimony; 2) the RFC is internally inconsistent; and 3) the RFC is inconsistent with the medical record as a whole. While the Court concludes that the first reason is not supported by substantial evidence, it finds that the second and third reasons offer adequate justification for the ALJ's conclusion.

The ALJ offered three examples of inconsistencies between Dr. Millard's RFC and Plaintiff's testimony. First, he pointed to Plaintiff's testimony that after he had received an epidural block, he could walk 20 to 30 minutes at a time; according to the ALJ, this was inconsistent with Dr. Millard's opinion that Plaintiff could would no more than two minutes out of twenty. Dr. Millard, however, did not state in his RFC that Plaintiff could walk no more than 2 minutes out of 20. Rather, he stated that in an 8-hour day, Plaintiff would need to take breaks every 20 minutes to walk, and those breaks would need to be 2-3 minutes in length. AR at 316. In fact, in response to the question of how *far* Plaintiff could walk without rest or severe pain, Dr. Millard stated that Plaintiff could walk 2 city blocks. Notably, the RFC form does not ask how *long* a claimant can walk at one time (though it does ask how long a claimant can walk overall in an 8-hour day). Therefore, the example offered by the ALJ regarding Plaintiff's walking limitation is not supported by substantial evidence.

Second, the ALJ pointed to Plaintiff's testimony that Plaintiff could pick up his 25-pound son as evidence that Plaintiff's limitations were not as severe as Dr. Millard opined. Yet Dr. Millard did not state in his RFC that Plaintiff could never lift 25 pounds. Rather, he stated that Plaintiff could lift 20 pounds occasionally and up to 50 pounds rarely. *Id.* It is not at all clear that Plaintiff's testimony is inconsistent with this RFC. Plaintiff testified, when asked by the ALJ whether he could

16

pick up his son, that he could. AR at 453, 459. But when the ALJ asked whether Plaintiff could do so "repetitively throughout the day," Plaintiff answered, "no, not at all," testifying that he only picked up his son when he cried. AR at 259.

Finally, the ALJ pointed to testimony that Plaintiff could "do some cooking, watching television, and reading." It is not clear how any of these activities might contradict Dr. Millard's RFC. Plaintiff testified that when he cooked, it usually amounted only to placing something in the microwave because the standing associated with cooking anything more elaborate was painful. Nor can the Court find any testimony by Plaintiff regarding his reading and watching television that is inconsistent with anything in Dr. Millard's RFC. In short, the alleged inconsistencies with Plaintiff's testimony that the ALJ pointed to in support of his conclusion do not constitute specific and legitimate reasons supported by substantial evidence.

The Court nevertheless concludes that the two remaining reasons offered by the ALJ – the internal inconsistency of the RFC and its inconsistency with the medical evidence as a whole – provide a sufficient basis for the ALJ's conclusion and, therefore, that the errors described above are harmless. *See Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (holding that an ALJ's error may be harmless in a social security case "where the mistake was nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion"). With respect to the internal inconsistency of the RFC, Dr. Millard stated that Plaintiff's prognosis was "good," but described Plaintiff as having quite severe physical limitations, including the inability to sit or stand for more than 5 minutes at a time. It is hard to square these two aspects of the RFC. More significantly, a review of the medical evidence in the record as a whole supports the ALJ's opinion that while the limitations set forth by Dr. Millard may accurately describe Plaintiff's limitations when he is having a flare-up of his symptoms, they overstate the limitations that Plaintiff experiences most of the time. Specifically, the medical records show that Plaintiff has gone long periods of time, sometimes 8 or 9 months following an epidural block, when his pain has been well controlled. He has also been able to control his pain with medication and exercise. The Court in particular notes that Dr. Millard's opinion that Plaintiff would need to be absent from work at least four days out of every month

17

because of his pain does not seem to be borne out by Plaintiff's medical records, in which there are long periods – months at a time – during which Plaintiff did not see a doctor.

On this basis, the Court concludes that the ALJ has offered specific and legitimate reasons, supported by substantial evidence, for his decision to reject the RFC of Dr. Millard.

### D.     ALJ's Credibility Finding

Plaintiff argues that the ALJ did not provide adequate justification for rejecting Plaintiff's testimony regarding his limitations and in particular, the degree to which Plaintiff's pain affects his ability to work. The Court concludes that the ALJ did not commit reversible error in this respect, even though it rejects some of the reasons offered by the ALJ for finding that Plaintiff was not credible.

In developing a claimant's RFC, the ALJ must consider limitations imposed by all of the claimant's impairments. SSR 96-8p. The ALJ must also consider "the impact of any related symptoms, including pain," when establishing the RFC. 20 C.F.R. § 404.1545; *see also* 20 C.F.R. § 404.1529(c)(4) (addressing how pain is assessed in determining ability to work). If a plaintiff produces medical evidence of underlying impairments consistent with his complaints and there is no affirmative evidence that he is malingering, the ALJ's reasons for rejecting the testimony must be clear and convincing. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). Social Security Regulations state that "the finding on credibility of an individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility," but must be grounded in the evidence and articulated in the ALJ's decision. SSR 96-7p; *see also Varney v. Sec'y of Health and Human Servs.*, 846 F.2d 581, 584 (9th Cir. 1988), rev'd on other grounds upon reh'g, 859 F.2d 1396 (9th Cir. 1988).

Here, the ALJ credited Plaintiff's testimony regarding "the kind of pain that he experiences," but did not credit Plaintiff's testimony that he suffers from this pain on a regular basis. Rather, the ALJ concluded that Plaintiff experienced "exacerbations" that were nothing more than "short-term events, controlled medically, and recurring so seldom as not to affect" Plaintiff's employability. In support of this conclusion, the ALJ cited to the record, stating, "the record shows that the nerve blocks consistently and significantly reduce the claimant's back and leg pain, at times for nearly a

year." He goes on to point to "unanswered questions in the claimant's work history and earnings" as well as testimony by Plaintiff in January 2004 that his epidural in September 2003 "did nothing" even though contemporaneous medical reflect that Plaintiff reported improvement in his pain.

The ALJ's reliance on "questions" about Plaintiffs tax records and on Dr. Lieberson's use of the word "retired" to describe Plaintiff in a medical report falls far short of the sort of clear and convincing reasons required to reject a claimant's pain testimony. As the ALJ conceded, he is not a tax expert. His suggestion that Plaintiff might have stopped working because his businesses were not turning a profit rather than because he was unable to work is little more than speculation.

Nor does Dr. Lieberson's use of the word "retired" support the ALJ's credibility finding. To retire merely means to "withdraw from one's position or occupation." Merriam-Webster Collegiate Dictionary, Tenth Edition (1998). The word is neutral with respect to the *reason* for withdrawing from one's occupation and could as easily describe a situation in which an individual stopped working due to physical impairments as it could a situation in which an individual stopped working to engage in water sports, for example. Indeed, it is not even clear if Plaintiff himself used the word "retired" and the ALJ did not take the opportunity to question Plaintiff about this at the administrative hearing. This evidence does not support the ALJ's credibility finding.

On the other hand, the ALJ's reliance on the medical record as a whole does provide a clear and convincing reason for concluding that Plaintiff's testimony was not entirely credible, and therefore, any error is harmless. As stated above, the medical evidence as a whole reflects that Plaintiff goes many months between epidural injections, which he has reported to his doctors have offered him substantial, if not complete, relief from his pain. The medical records further reflect that Plaintiff's remaining pain is controlled by medication. For example, despite his statement to the contrary in his Daily Activities Questionnaire, Plaintiff reported improvement following his September 2003 epidural injections.

On this basis, the Court concludes that the ALJ has offered clear and convincing reasons for his credibility finding.

**E. Reliance on Grids**

Plaintiff argues that the ALJ erred in relying on the Grids at Step Five to reach a finding of not disabled. The Court disagrees.

Where a claimant suffers from both exertional and non-exertional impairments, "the ALJ must determine how much the claimant's work capacity is further limited by non-exertional restrictions." *Allen v. Sec'y of Health and Human Servs.*, 726 F.2d 1470, 1472 (9th Cir. 1984) (citing 20 C.F.R. pt. 404, subpt. P. app. 2. § 200.00(e)(2)). Typically, this involves reliance on testimony from a vocational expert. However, where a claimant suffers from only exertional impairments, the ALJ may rely on the Medical Vocational Guidelines ("the Grids") outlined in 20 C.F.R. Part 404, Appendix 2 to make a determination that substantial work is available to the claimant.

Here, the Court has concludes that the ALJ did not err in finding that Plaintiff had only exertional limitations. Accordingly, the ALJ's reliance on the Grids in support of his conclusion at Step Five is not erroneous.

**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendant's Motion and DENIES Plaintiff's Motion. The decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

Dated: April 14, 2008

JOSEPH C. SPERO
United States Magistrate Judge